IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE:<br><br>ROBERT J. MOSKO, JR. and<br>BRENDA R. MOSKO,<br><br>Plaintiffs,<br>v.<br><br>AMERICAN EDUCATION SERVICES,<br>GENERAL REVENUE CORPORATION,<br>DIVERSIFIED COLLECTION SERVICES,<br>INC., and SLMA SERVICING CORP.,<br><br>Defendants. | Case No. 04-52834<br><br>Adv. No. 04-6077 |

**MEMORANDUM OPINION**

This matter came before the Court for trial on September 1, 2005 upon the Complaint to determine the dischargeability of the student loan debt of Robert Mosko, Jr. and Brenda Mosko (the "Debtors"), filed on December 30, 2004. The Debtors' student loan debt is owed to American Education Services, General Revenue Corporation, Diversified Collection Services, Inc., and SLMA Servicing Corporation (the "Defendants"). Educational Credit Management Corporation ("ECMC") is the successor owner and holder of the student loan debt. Richard L. Jackson appeared on behalf of the Debtors, and Anna S. Gorman appeared on behalf of ECMC.

The sole issue before the Court is whether holding the student loan debt non-dischargeable would impose an undue hardship on the Debtors. In order to determine this issue, the Court must find three things: (1) that the Debtors cannot maintain a minimal standard of living for themselves and their dependants if forced to repay the student loans; (2) that such a state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and (3) that the Debtors

have made a good faith effort to repay the student loans. The Court is satisfied that the female Debtor met her burden of proof on each of these elements and that the student loan debt owed to the Defendants by the female Debtor should be discharged. The male Debtor failed to meet his burden of proof under one element and is not entitled to a full discharge; however, a partial discharge of his student loan debt is appropriate.

Based upon a review of the evidence presented at the hearing, the arguments of counsel, and a review of the entire official file, the Court makes the following findings of fact and conclusions of law.

## FACTS

1. Several years ago, the female Debtor incurred student loan debt in order to finance her education. The female Debtor has a Bachelor of Arts Degree from Old Dominion University and a Masters Degree in Music from the University of North Carolina at Greensboro. As of July 17, 2005, the current balance of the female Debtor's student loan debt was $57,156.41.

2. The female Debtor is currently employed as a music teacher at a middle school in North Carolina.

3. The male Debtor also incurred educational loans. The male Debtor has a Bachelor of Science Degree in Information Systems from the University of North Carolina at Greensboro. As of July 17, 2005, the current balance of the male Debtor's student loan debt was $63,417.06.

4. The male Debtor was laid off in 2003 and is currently unemployed.

5. The Debtors have a four-year-old son.

6. On December 30, 2004, the Debtors filed this adversary proceeding seeking to discharge their student loans pursuant to Section 523(a)(8) of the Bankruptcy Code.

ANALYSIS

Section 523(a)(8) of the Bankruptcy Code governs the dischargeability of student loans. Section 523(a)(8) allows student loan debt to be discharged only if excepting the debt from discharge would impose an undue hardship on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8). Thus, the sole issue is whether holding the debt non-dischargeable would be an undue hardship on the debtor. The Second Circuit case of Brunner v. NY State Higher Education Services established a three-part test to determine undue hardship. Brunner v. NY State Higher Education Services, 831 F.2d 395 (2nd Cir. 1987). The Fourth Circuit adopted the Brunner test in Ekenasi v. The Educ. Resources Inst. (In re Ekenasi), 325 F.3d 541, 546 (4th Cir. 2003).

Under the Brunner test, the debtor must prove three things: (1) that the debtor cannot maintain a minimal standard of living for herself and her dependents if she is forced to repay the student loan; (2) that additional circumstances exist indicating that such a state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and (3) that the debtor has made a good faith effort to repay the loans.

The debtor bears the burden of proof on each element by a preponderance of the evidence, and each element must be satisfied before discharge is granted. See Grogan v. Garner, 498 U.S. 279, 291 (1991). The creditor bears the initial burden of proving that the debt exists and is the type excepted from discharge under Section 523(a)(8); then the burden shifts to the debtor to prove by a preponderance of the evidence that excepting the loan from discharge will be an undue hardship. See In re Savage, 311 B.R. 835, 839 (1st Cir. BAP 2004).[1] The debtor bears the burden of proving

[1]The parties stipulated to the existence, type, and amount of the debt. ECMC has thus satisfied its burden of proof.

by a preponderance of the evidence that her circumstances warrant a discharge of the student loans on the basis of undue hardship. See McCormick v. Diversified Collection Servs., Inc., 259 B.R. 907, 909 ( 8th Cir. BAP 2001).

A. Minimal Standard of Living

Under the Brunner test, the debtor must prove that she cannot maintain a minimal standard of living for herself and her dependents if forced to repay the loan. However, the Brunner test does not define what constitutes a minimal standard of living. To determine this element, the court must evaluate whether the debtor has maximized her income and minimized her expenses. See, e.g., In re Perkins, 318 B.R. 300, 309 (Bankr. M.D.N.C. 2004)(court must evaluate whether the debtor has maximized her income and minimized her expenses); In re Murphy, 305 B.R. 780, 793 (Bankr. E.D. Va. 2004)(implicit is the requirement that the debtor demonstrate that she is actively minimizing her and her dependents' current household living expenses while maximizing personal and professional resources). In order to determine that the debtor is minimizing her current expenses, the court must examine the reasonableness of the expenses listed in the debtor's budget. See In re Perkins, supra, at 309, citing In re Pincus, 280 B.R. 303, 317 (Bankr. S.D.N.Y. 2002).

A minimal standard of living does not require a debtor to live in poverty, but it does require her to reduce her expenses to an amount that is minimally necessary to meet her basic needs. See In re Murphy, supra, at 793. "The minimal standard of living factor has been interpreted to require a showing beyond significant forbearance in personal and financial matters or beyond a restricted budget." In re Pincus, supra, at 317. A court should be sensitive to the individual circumstances of each case. See id.

A review of the reported cases is instructive regarding the types of expenses that are

inconsistent with a minimal standard of living.  See Perkins, supra, at 310.  See also Pincus, supra, at 318 (finding expenses such as $50 per month on newspaper and magazine expenses "excessive in light of the sacrifice expected of an individual to repay his student loan obligations"); In re Buchanan, 276 B.R. 744, 751-52 (Bankr. N.D. Va. 2002)(finding expenses for home internet service and movie rentals unreasonable in the context of § 523(a)(8)); In re East, 270 B.R. 485, 494 (Bankr. E.D. Cal. 2001)(observing that basic cable television was not necessary to maintain a minimal standard of living).  401(k) contributions are generally not regarded as reasonably necessary for the support or maintenance of a debtor and thus may be considered income from which a debtor seeking to discharge her student loans could use to repay an educational loan.  See In re Pobiner, 309 B.R. 405, 409 (Bankr. E.D.N.Y. 2004).

The debtor is not required to give up all but the basic necessities.  One court found that the first prong of the Brunner test was satisfied where a debtor worked part-time selling Mary Kay products (she could not work a regular work-week because of the medical care that she had to give her disabled spouse), had a monthly housing payment of $843.40 per month for a family of five, and the monthly budget did not include any funds for recreation, clothing, lessons for the children, or therapy for the children.  In re Smith, Case No. 00-51738, Adv. No. 01-6013 slip op. at 4 (Carruthers, J. May 3, 2002).  Another court fount that the minimum income standard was satisfied where the debtor had two dependent children, earned an annual salary of $23,975, and had a monthly take home pay of $1,620.  See In re Coulson, 253 B.R. 174, 176 (Bankr. W.D.N.C. 2000).  The debtor's monthly expenses for her family totaled approximately $1,900 per month, including approximately $400 in additional expenses for heating, food, clothing, and medical care for which she could not pay for lack of income.  See id.  The debtor testified that she took steps to keep her

monthly expenses low, such as purchasing outdated food items, buying clothing from thrift stores, and using kerosene heaters instead of electric heat. See id. Further, the debtor was constantly searching for a higher paying job and had already moved her family twice in search of better wages. See id. The student loan creditor argued that the debtor could reduce her monthly expenditures of $63 to repay a loan from her retirement fund, $28 allowance for her two children, $27 on cigarettes, $15 on herbs and medicines, $35 on school and boy scouts, $50 on stamps and miscellaneous, and $50 on legal and tax preparation fees. The court disagreed and found that the debtor's expenses clearly exceeded her income despite her efforts to minimize her expenses. See id. The court further stated that, "even if the Court were so callous as to require the debtor to eliminate every single dollar of spending which was not absolutely necessary, such as allowance for her children, debtor would still not have sufficient income to maintain a minimal standard of living while repaying her student loans." See id.

In the matter before the Court, both Debtors testified that the Debtors' average total monthly net income is $1,400.[2] This income is earned by the female Debtor through her job as a music teacher. The female Debtor has been employed as a music teacher for thirteen years. She testified that she is certified to teach music for grades kindergarten through twelve but is not licensed or certified to teach any other subject. The female Debtor is working in her field of training and has

---

[2] A pay-stub of the female Debtor revealed gross monthly pay of $3,833 and net pay of $1,171.76 for the month of April 2005. The female Debtor withholds the following per month: $450 to pay her salary for the summer months, $229.98 for mandatory state retirement, $334.50 for federal income tax, $222.82 for social security, $165 for state income tax, $9 for life insurance, $41.50 for liability insurance for teachers, $5 for charitable contributions to the United Way, $100 to repay a 401(k) loan (the Debtors borrowed against 401(k) funds to keep their vehicle from being repossessed), $48 for vision health insurance, $11.70 for dental health insurance, and an average of $627.33 for health insurance.

been doing so since she graduated from college.

The male Debtor is unemployed. He was employed with Wachovia Bank until he was laid off in 2003. The male Debtor's training is in Cobalt computer programming, which he testified is used on mainframe computers at very large companies. There are only a few companies within driving distance of the male Debtor that use Cobalt[3] programming, and the Debtor testified that most of those were outsourcing this type of work to foreign countries.

The male Debtor suffers from several medical ailments, including excessive daytime sleepiness, narcolepsy, periodic limb movement syndrome, and chronic obstructive pulmonary disease. The male Debtor's sleep disorders require him to purchase several medications per month and to use a C-Pat machine when sleeping. He testified that his sleep disorders prevent him from driving, and thus, working anywhere other than from home. When the male Debtor worked for Wachovia Bank, he did so remotely from home. He testified that any job he may obtain would have to allow him to work remotely.

After the male Debtor was laid off from Wachovia Bank, he was briefly employed by Lowe's Home Improvement ("Lowe's"). However, he testified that he was terminated from Lowe's when he became disabled because of his sleep disorders. He has not been employed full-time since 2003. The male Debtor testified that, soon after he was laid off from his job at Wachovia Bank, he was offered a position as a full-time contract employee but that he did not accept the position because he did not agree with the employer's practice of not paying over-time pay. He further testified that the position was an on-site position and that he would be unable to work there now because of his

[3]The male Debtor testified that Wachovia Bank, Lowe's Home Improvement, Bank of America, and Branch Banking & Trust Company use computers that require Cobalt programming.

medical condition.

Recently the male Debtor took two on-line courses through Davidson Community College concerning computer trouble shooting. He testified that he took the courses to expand his knowledge and to improve his chances for future employment.

Unfortunately, the male Debtor's medical condition makes him less than the ideal employee. He is not able to drive and thus can only work from home. He testified that he might fall asleep at any moment. He is trained in a field where jobs are routinely being outsourced overseas. While the Court believes that the male Debtor could contribute some amount of income to the family budget, the Court realizes that such a contribution might not be significant given the current state of the male Debtor's health and training.

The Debtors' monthly expenses exceed their monthly income. The male Debtor testified that their basic monthly expenses total $2,656. This includes the following: $450 for rent, $140 for utilities, $27 for telephone, $50 for long distance service, $75 for internet service[4], $420 for day care (for which the Debtors pay a reduced rate because the female Debtor is employed by the county), $415 for their car, $475 for groceries, $100 for car insurance, $15 for trash collection, $24 for the male Debtor's C-Pat machine, $75 (average) for the mask for the C-pat machine, $150-$200 for medications, and $350 for gas.[5] The Debtors's expenses exceed their income by $1,200 per month. The Debtors' expenses are reasonable and are certainly not excessive or luxurious. Further, the

---

[4] Internet service is not a necessity. The Court will discount expenses to $2,600 for purposes herein.

[5] There are other monthly expenses of the Debtors that the Court will not include in its calculation because the same are not necessities. These include $80 per month for cell phones and $60 for cable television.

Debtors' monthly expenses for rent and food are low for a family of three. The budget also has no room for essentials like clothing or doctor visits.

The Court is satisfied that the Debtors have met their burden of proof on the minimal standard of living element of the Brunner test.

B. Additional Circumstances

The second prong of the Brunner test requires a showing that additional circumstances exist that indicate that an inability to pay is likely to persist over a significant portion of the loan repayment period. See Perkins, supra, at 324. A discharge of education loans must be based not simply upon a present inability to pay, but rather upon a certainty of hopelessness that the plaintiff will ever be able to pay. See, e.g., In re Goulet, 284 F.3d 773, 778 (7th Cir. 2002); In re Brightful, 267 F.3d 324, 328 (3rd Cir. 2001); In re Murphy, 305 B.R. 780, 797 (Bankr. E.D. Va. 2004). Examples of "additional circumstances" that have satisfied the second prong of the Brunner test in some cases include medical problems, lack of usable job skills, or severely limited education. See Perkins, supra, at 324, citing In re Roberson, 999 F.2d 1132, 1137 (7th Cir. 1993). However, it is well established that a debtor's medical or psychological condition will not constitute additional circumstances for purposes of the Brunner undue hardship test unless it impairs her ability to work. See Perkins, supra, at 324, citing In re Goulet, 284 F.3d 773, 779 (7th Cir. 2002)(holding that the debtor's substance abuse issues did not constitute additional circumstances under the second prong of the Brunner test where they did not impair his ability to work).

The list of factors that may constitute additional circumstances is extensive and includes the following: serious mental or physical disability of the debtor or the debtor's dependents that prevents employment or advancement, the debtor's obligation to care for dependents, lack of, or severely

limited education, lack of useable job skills, underemployment, maximized income potential in chosen educational field, no other more lucrative job skills, and age or other facts that prevent relocation or training. See In re NYS, 308 B.R. 436, 442 (9th Cir. BAP 2004).

As discussed above, the Debtors' expenses are higher than their income by $1,200 per month, leaving no excess income with which to repay their student loans. The female Debtor is earning at her peak income potential, i.e., she is employed in her field of education in the position for which she is trained. Her position is unlikely to improve beyond cost-of-living pay increases. The female Debtor has satisfied her burden of proof on the additional circumstances element of the Brunner test.

The male Debtor currently contributes no income to the household. The male Debtor testified that he has serious medical problems that prevent him from working outside the home. However, the male Debtor has skills, is employable now, and is working to improve or expand his skills. It is foreseeable that the male Debtor could contribute some amount of income, even if his medical condition did not improve. The male Debtor offered no evidence that his medical condition could not or would not improve or that his symptoms could not be controlled with medication or other treatment.

Unfortunately, the Debtors' situation may not significantly improve in the future repayment period of their loans. The female Debtor's salary is unlikely to increase significantly. The male Debtor is skilled in an industry in which demand may actually be decreasing as jobs are being outsourced overseas. With his current skills, the male Debtor testified that he could only work at a few companies, none of which have been willing to employ him. Further, the male Debtor currently can only work from home due to his medical condition. Of the few companies that employ Cobalt programmers in the area, the male Debtor testified that only Wachovia Bank allowed

employees to work remotely, and he had been unsuccessful in gaining employment with Wachovia Bank since he was laid off from there in 2003. It is clear that the male Debtor would need to obtain new or improved skills in order to obtain employment; even then, he would have to find employment that he can do remotely.

The bottom line is that the Debtors begin each month so far in the red that the male Debtor would have to get a job paying at least $30,000[6] per year in order to merely break even on their monthly expenses. Based upon testimony of the Debtors' prior tax returns, it appears that the male Debtor made between $30,000 and $35,000 per year when he was employed in his field.[7] However, when the male Debtor was employed with Wachovia Bank, he was not experiencing the health problems that he is currently experiencing. In fact, the male Debtor testified that he would not be able to do the work he was doing for Lowe's (which occurred after he worked at Wachovia Bank) at this time because his sleep disorders have worsened, and he can no longer drive a car. It is questionable whether the male Debtor is currently employable at any job that would pay him $30,000 or more per year. He is in poor health, cannot drive, and must work remotely, none of which are attractive attributes to a prospective employer. However, the Court believes that there is hope that the male Debtor's situation will improve. The male Debtor has recently completed two computer related courses, which will likely make him employable at least on a limited basis. Further, no

---

[6]The female Debtor nets approximately $1,400. The male Debtor would need to net $1,200 per month, and the Court estimates that a salary of $30,000 per year would likely produce such a net income.

[7]Testimony of the Debtors' tax returns were as follows: adjusted gross income for 2002 was $75,546; adjusted gross income for 2003 was $78,363; adjusted gross income for 2004 was $64,130.

evidence was presented on the expected duration of the male Debtor's medical condition. The male Debtor is in his late thirties and has many more working years ahead of him. Will his condition improve with medication? Will his condition improve if he loses weight and/or quits smoking? Are all of his medical conditions permanent? These are questions that were not addressed. The burden of proof is on the Debtors, and the male Debtor did not meet his burden of proof on the additional circumstances prong of the Brunner test.

C. Good Faith

The final prong of the Brunner test requires the Debtors to show that they made a good faith effort to repay their student loans. This inquiry is measured by a debtor's efforts to obtain employment, maximize income, and minimize expenses. See Perkins, supra, at 28, citing In re Goulet, 284 F.3d 773, 779 (7th Cir. 2002); In re Murphy, 305 B.R. 780, 798 (Bankr. E.D. Va. 2004). Another important consideration is "whether the debtor actually made any payments, and if so, the total amount of the payments." In re Murphy, supra, at 798-99 (finding that the debtor had not made a good faith effort to repay her educational loans where she had negotiated forbearances and deferments but had never made a payment); see also In re McClain, 272 B.R. 42, 48-49 (Bankr. D.N.H. 2002)(finding lack of good faith where the debtor had made only three payments totaling $300); In re Pincus, 280 B.R. 303, 316-17 (Bankr. S.D.N.Y. 2002)(finding a good faith effort to repay where the debtor had made 22 payments totaling $10,000 on his student loans and had continued making payments until the month before his bankruptcy filing). Failure to make payments will not constitute bad faith if the debtor had no funds available for payment toward the loan. See Murphy, supra, at 798-99; see also In re Fuller, 296 B.R. 813, 819 (Bankr. N.D. Cal. 2003)(finding that the debtor had failed to establish a good faith effort to repay his roughly $240,000 in student

loan debt where he made only a few payments toward that debt but had the ability to make more, as evidenced by the fact that he continually made payments on his credit card debt). Also, a debtor's choice to work in a low paying field is not by itself an indication of bad faith, nor should it be used against a debtor in an evaluation of undue hardship. See In re Oyler, 300 B.R. 255, 259 (6th Cir. 2003)(finding that debtors may choose to work in worthwhile albeit low paying professions).

The male Debtor testified that for a two-year period prior to his being laid off at Wachovia Bank he made regular payments on the student loan debt through an automatic payment account. After he was laid off, he testified that the Debtors made sporadic payments on their loan debt and that they "paid when they could." The Debtors further requested deferments and forbearances on the loans in order to attempt to repay the debt, which were granted, but the Debtors have used up their available deferments and forbearances.

The Debtors met their burden of proof on the good faith prong of the Brunner test. When the male Debtor was regularly employed, an automatic payment account was set up to make payments toward the student loan debt, whereby approximately twenty-four payments were made. Next, the Debtors attempted to manage the loan debt through lender granted forbearances and deferments as long as they could. Finally, after the male Debtor was laid off and the Debtors' financial situation was quickly deteriorating, the Debtors still attempted to make payments on the loans.

The Court is unpersuaded by ECMC's argument that the Debtors have not made a good faith effort to repay their loans because they have not exercised the Ford Repayment Option or Income Repayment Option (the "Ford Repayment Option") offered to the Debtors by ECMC.[8] The male

---

[8]The William D. Ford Loan Consolidation Program allows loans to be consolidated and payments on the consolidated loans to be adjusted based on a formula that takes into account a debtor's adjusted gross income and poverty guidelines. Debtors can make payments at the reduced

Debtor testified that the Debtors discussed the Ford Repayment Option with their attorney but rejected it as a viable option because payments under the Ford Repayment Option were $315 per month. The male Debtor testified that the Debtors do not have $315 per month to pay to ECMC, and their budget certainly supports their assertion. The fact that the Ford Repayment Option is available to a debtor may be considered, but it should not be given great weight. See In re Alderete, 308 B.R. 495, 499 (10th Cir. BAP 2004)(finding that the bankruptcy court erred in placing significant weight on the Ford Repayment Program given that the debtor may or may not have been eligible and that the debtor could not afford the $70 per month that she would owe under the Ford Program if she were eligible); In re Nys, 308 B.R. 436, 440 (9th Cir. BAP 2004)(holding that even if the debtor were eligible for the Ford Repayment Program, she was fifty-two years old, and her income would decrease after she retired in thirteen years); In re McLaney, 2004 WL 2009394 (Bankr. M.D. Ala. 2004)(court discussed the Ford Repayment Program under the good faith analysis but did not give the program much weight once the court determined that even the reduced payments were not feasible).

Based on the Debtors' tax returns for 2004, their payment under the Ford Repayment Option would be approximately $315 per month. The Court is satisfied that the Debtors cannot pay $315 per month and could not do so even if the male Debtor could return to his former position at Wachovia Bank. The Ford Repayment Option is not a viable option for the Debtors.

Partial Discharge

This Court is satisfied that the female Debtor met her burden of proof on every element of

---

amount for twenty-five years, after which time the debt remaining on the consolidated loan is forgiven. See In re Alderete, 308 B.R. 495, 499 (10th Cir. BAP 2004).

the Brunner test. As such, her debt to ECMC constitutes an undue hardship on her, and her student loan debt shall be discharged in its entirety.

The male Debtor was unable to demonstrate that there was a certainty of hopelessness regarding his future ability to pay his student loan debt and thus failed to meet the second prong of the Brunner test. The Court believes that the male Debtor could and should be contributing some income to the household. However, the Court also believes that the male Debtor is unable to contribute an amount that would equal what he was earning when he was able to work full-time prior to the onset of his medical problems. While the Court cannot discharge all of the male Debtor's student loan debt, the Court finds that paying the entire amount of his student loan debt would be an undue hardship on the male Debtor.

The Fourth Circuit has not yet addressed the partial discharge of student loans. However, a majority of courts that have considered the question have concluded that Section 523(a)(8) permits partial discharge. See In re Kapinos, 243 B.R. 271, 275 (Bankr. W.D. Va. 2000), citing In re Hornsby, 144 F.3d 433, 438-40 (6th Cir. 1998), and In re Roberson, 999 F.2d 1132, 1136 (7th Cir. 1993). In Kapinos, the creditor argued that Section 523(a)(8) did not explicitly authorize a partial discharge, so the bankruptcy court could not grant one. The court deemed this argument "unpersuasive." Id. at 275. Looking to congressional intent (lowering the amount of debtors discharging student loans), the court said that "to use an all-or-nothing approach 'has the effect of rendering large debt more likely of discharge, and rewarding irresponsible borrowing, neither of which can be presumed to be part of congressional intent.'" Id. at 276, citing In re Brown, 239 B.R. 204, 211 (Bankr. S.D. Cal. 1999). "The fact that § 523(a)(8) does not, on its face, provide for partial discharge does not render the court powerless to interpret § 523 in a manner which comports with

the over riding intent of Congress." Id. citing U.S. v. Ron Pair Enter., 489 U.S. 235, 242 (1989)(noting that when a "literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, . . . [then] in such cases, the intention of the drafters, rather than the strict language, controls.")

A majority of courts have held that bankruptcy courts are empowered to partially discharge a debtor's student loan by virtue of Section 105. See id., citing In re Hornsby, 144 F.3d at 140. This "statutory directive is consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." Id., citing U.S. v. Energy Resources Co., 495 U.S. 545, 549 (1990).

In addition, the Kapinos court stated as follows:

> This court can identify no policy rationale for ignoring the flexibility of § 105 and requiring an all-or-nothing approach to § 523(a)(8). Such a rule would operate to either relieve a debtor from any obligation to repay a loan, though the debtor is capable of making some repayment, or force a debtor to repay the entirety of a loan and therefore fail to satisfy the Bankruptcy Code's objective of relieving 'the honest debtor from the weight of oppressive indebtedness and permitting him to start afresh.'

Id. at 277, citing Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934). The court

> therefore concludes that § 523(a)(8), understood in combination with § 105, authorizes partial discharge of student loans. If the bankruptcy court finds that imposing the entire amount of the student loan debt on the debtor would be an undue hardship, it may, in exercise of its equitable power, discharge all of the debtor's loans or only a portion of them. Likewise, the bankruptcy court may exercise its equitable power under § 105 to discharge a portion of the student loans even if it finds that the Brunner standard has not been satisfied.

Id.

In Educational Credit Management Corp. v. Jones, 1999 WL 1211797 (E.D. Va. 1999), the issue before the court was whether a student loan could be partially discharged. The court agreed

with the majority of courts that bankruptcy courts can grant a partial discharge. The court stated that "the partial dischargeability or other modification of a student loan debt accomplishes Congress' purpose of providing debtors with a 'fresh start' while maximizing the repayment of the debt." Id. at 3. Treating student loan dischargeability as an all-or-nothing proposition "would yield absurd results in certain circumstances." Id. The court further stated "the words 'undue hardship' suggest a matter of degree. Financial hardship is not all-or-nothing, but is more or less. The load may be made bearable by reducing, rather than eliminating it." Id., citing In re Heckathorn, 199 B.R. 188, 195 (Bankr. N.D. Okla. 1996). "The Congressional scheme is better carried out by permitting partial discharge or some other modification of the student loan debt in certain circumstances." Id.

In In re Mort, 272 B.R. 181 (Bankr. W.D. Va. 2002), the bankruptcy court discharged all interest on the debtor's student loan through April 15, 2004, as well as all attorneys' fees, expenses, and collection costs, and found that the debtor would make monthly payments of $60 until the debtor reached age sixty-five (she was forty-nine), at which time the balance would be discharged. See id. at 184. The Mort court noted that many courts have held that Section 523(a)(8) permits the partial discharge of a student loan debt and held that "the plain language of the statute does not require an 'all-or-nothing' approach to the discharge of student loans and that the clear legislative intent of the exemption supports the power to grant a partial discharge of such a debt." Id., citing In re Kapinos, supra, at 275-76. However, the court found that "the power to grant the discharge of a student loan debt – whether of the whole debt or only a portion thereof – must be conditioned upon a finding of undue hardship. Otherwise, § 523(a)(8) would be without practical effect." Id. Instead of an all-or-nothing approach, the court said that "the better approach is to permit a partial discharge only to the extent that it would be an undue hardship for that part of the loan obligation not to be discharged."

Id., citing East v. Educ. Credit Mgmt. Corp., 270 B.R. 485, 493 (Bankr. E.D. Cal. 2001).

In this case, it would be an undue hardship on the male Debtor to repay the full amount of his student loans. The Court believes that the male Debtor can repay a portion of his student loan debt without such repayment being an undue hardship. If the male Debtor were to repay the entire $63,417 over twenty-five years, with no interest or fees, the monthly payments would be approximately $211 per month. Of course, under the terms of the loan, a substantial amount of interest would accrue.

The Court finds that it would not be an undue hardship on the male Debtor to pay $100 per month on his student loan debt until he reaches the age of sixty-five.[9] The Court hereby discharges all interest on the male Debtor's student loan obligations, and all attorneys' fees, expenses, and collection costs. The male Debtor shall pay $100 per month to ECMC until the male Debtor reaches the age of sixty-five, at which time the remaining balance of the student loan debt shall be discharged in its entirety.

## CONCLUSION

The student loan debt owed to ECMC by the female Debtor is hereby discharged. The student loan debt owed to ECMC by the male Debtor is partially discharged and shall be repaid in accordance with the terms set out above.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

[9] The male Debtor is approximately thirty-eight years old. Payments of $100 per month will thus yield approximately $32,400 to ECMC.

September 29, 2005

THOMAS W. WALDREP, JR.
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE: | |
| ROBERT J. MOSKO, JR. and BRENDA R. MOSKO, | Case No. 04-52834 |
| Plaintiffs, | Adv. No. 04-6077 |
| v. | |
| AMERICAN EDUCATION SERVICES, GENERAL REVENUE CORPORATION, DIVERSIFIED COLLECTION SERVICES, INC., and SLMA SERVICING CORP., | |
| Defendants. | |

CERTIFICATE OF SERVICE

Parties in Interest

Brenda R. Mosko

Robert J. Mosko, Jr.

Richard L. Jackson, Esquire

Anna S. Gorman, Esquire